On our argument calendar is Alderson v. Saul. And Alderson v. Saul is another Social Security case. It's set for 10 minutes per side. For the appellant, we have Mr. Tree. Your Honor, would it be possible just to have two minutes? I've got to pull up Alderson's file. I had Ballew's file pulled up, Your Honor. Just take me just like two minutes, I think. Yeah, that's fine. The court will recess for two minutes. Okay. This court now resumes its session. And so for Mr. Tree, it will be for the appellant. And for the government, we have Mr. Stuckey. Okay, Mr. Tree, please proceed. Thank you, Your Honor. I would like to reserve two minutes for rebuttal. Ms. Alderson's parents divorced when she was a young child. Ms. Alderson experiences significant guilt due to feelings her parents' arguments were because of her. She had a long history of abuse, including witnessing violence between her parents, enduring physical and emotional abuse herself, having a knife thrown at her by her father, being sexually abused by an adult male relative. She has been diagnosed and treated with post-traumatic stress disorder, anxiety, and depression. She has difficulty sleeping throughout the night, has nightmares. Could you hold on for a minute? Could you lift up one hand? Because I think your screen is frozen. Ah. Do we have the right? Okay. Okay. Now I see it, and now it's not. Go ahead. Okay. Thank you, Your Honor. Ms. Alderson has difficulty sleeping throughout the night, has nightmares. She has many triggers that cause her to relive her trauma. She suffers from panic attacks, and she often isolates herself. The ALJ found she, in fact, did have severe depression and anxiety. When Ms. Alderson was in school, during elementary school, she was in special education, and she had an individual education plan called an IEP. She was tested by a school psychologist and found she had a full-scale IQ of 78. Her cumulative grade point average in high school was 1.5. She was unable to pass any of the Washington State minimum testing standards in reading, writing, and math, and did not graduate from high school. She had head injuries with associated concussion and loss of consciousness, and she suffers from cognitive impairments. In addition, the administrative law judge found that she suffered from 10 different severe physical impairments. These include severe double-jointed hips, sacroiliac joint dysfunction, ligament impairments, polyarthralalgia, chronic pain, chronic headaches of the migraine sort, asthma, morbid obesity, obstructive sleep apnea, and chronic fatigue. Dr. Schultz performed an independent psychological exam for the Social Security Administration. He was SSA's expert consultant examiner. He found that Ms. Alderson would not be consistent in attendance at work if she were working at ER 553. The vocational expert testified that a person that misses more than one day of work per month would be unable to sustain any unskilled work. The ALJ gave SSO's own independent medical examiner little weight for three reasons, none of which are specific and legitimate, let alone clear or convincing. First, because Dr. Schultz stated that Anderson had an IEP. This was really confusing to me. The ALJ says, I discredit Dr. Schultz because Dr. Schultz said that she had an IEP, but he didn't review the educational records. But she did have an IEP. The judge knew it. It's in the record. It's in the educational records. It also was testified to by Dr. Rubin, who the ALJ gave full weight to, great weight to, and he testified exactly to the same thing. So if Ms. Alderson had lied to Dr. Schultz and said she had an IEP when she didn't, and the record showed she didn't, that would be a reason to discredit him and Ms. Alderson. But Ms. Alderson told the truth. She did have an IEP. There's no reason to discredit Dr. Schultz based on an accurate and truthful statement. I guess I took the ALJ's point there to be not so much that that was evidence of an error on Dr. Schultz's part, because, as you say, she did indeed have an IEP, but the fact that he hadn't reviewed the educational records means that the mere fact that there was an IEP doesn't really tell you anything about what the person's disability was or what the person's condition was. And so I think what the ALJ was trying to say is, given that he didn't look at the educational records, the inference is that he was overly reliant on her own subjective report of her condition. So can you address that? Yes, so that, yeah, the ALJ's, I agree, the ALJ's point was he didn't see the IEP, but she did have an IEP, and he said that his cognitive, his limitations that he gave were discredited because he relied on her having an IEP without actually seeing the school records. Well, his limitation regarding attendance was clearly based on social limitation, not cognitive limitations. The cognitive limitations had to do with learning new tasks, and Dr. Schultz clearly made that point. So it didn't have any, it wasn't relevant to the issue of attendance, which was based on the social limitations. Second, he may have had the educational records. The ALJ assumes he didn't. Here's the evidence in the record that shows he very well may have had the educational records. It's because this was an evaluation that was requested by the state agency at the initial level of the application process. Typically, they'll turn over educational records to a consultant, psychological consultant. The record shows they had received educational records prior to the doctor's evaluation. So it would be standard practice to turn it over to him. The doctor mentioned what medical records he had reviewed. He didn't mention if he'd reviewed any other function reports that they typically give to the doctor or any other educational records. So he had some pretty good detail about the IEP, which is consistent with the educational records. So we don't know for sure that he didn't have the educational records. Ms. Alderson is only, what, 24 years old right now? Yes. This is about the youngest applicant I've ever had in my experience looking for disability. But it sounds to me like maybe your best case may be related to a lack of a second psychological exam. Dr. Rubin recommended it, but the ALJ turned that request down by Ms. Alderson's counsel. Is that a big point or not a big point in your opinion? I think it's a very big point, a very significant point, because the ALJ said, I give great weight to Dr. Rubin. ALJ didn't reject anything that Dr. Rubin said. As you stated, multiple times during his testimony, he asked for a consultative examination. He basically was crediting Dr. Schultz and said that he agreed with Dr. Schultz's limitations regarding attendance deficits. But that was in 2016 when she first applied. It was now 2018 when the ALJ held his hearing, and he said, I don't have any functional limitations for 2018. I need a consultative exam to be able to give a full opinion here. And he said, furthermore, regarding that, I might have went blank here. Anyway, yeah, that is a very important point, Your Honor. Does the record reflect any reason why the ALJ denied a second psychological exam? It does. At the hearing, the ALJ stated, Dr. Rubin requested it, and then the attorney, I wasn't the attorney at the hearing, but the attorney at the hearing then asked the ALJ, Your Honor, we would request a consultative exam, as Dr. Rubin had indicated. And the ALJ said, request denied. I find this claimant is very capable and that she can work. I deny your request. Well, that's troubling because Dr. Rubin said, yeah, I agree with Dr. Schultz, but now it's 2018. Maybe she should try to work. And I don't know if she'd be successful in working, but she should try to work. Dr. Rubin didn't know that she had actually had tried to work. She was working part time and doing very poorly at it. She was informed by her counsel at the hearing. The counsel told Dr. Rubin, hey, she is working, and Dr. Rubin lit up and said, oh, how's that going? And the ALJ wouldn't allow the attorney to explain how it was going, but the record showed it was going very poorly, and the job ended because of stress and that she wasn't able to do it. She'd lost focus and wasn't able to do it. So she had tried, and that's what Dr. Rubin wanted to see. You've got to have a try if you actually can do it or not. Counsel, did you want to reserve any time for rebuttal? I see your time is up, but I'll give you a minute for rebuttal anyway. Thank you, John. Okay, so now we'll hear from the government, please. Good morning. I'm Shada Stuckey, appearing on behalf of the commissioner of the Social Security Administration. We ask the court to affirm the judgment of the district court because substantial evidence supports the administrative law judge's findings and her conclusion that Ms. Alderson was not disabled under the Social Security Act. Ms. Alderson challenges the ALJ's assessment of the medical opinion evidence addressing mental limitations. But of the four medical opinions on this matter, the ALJ rejected only one and provided valid reasons for doing so. The ALJ then assessed a residual functional capacity that aligned with the opinions of two state agency doctors and a medical expert who reviewed the record and testified at the administrative hearing. All of these doctors opine that Ms. Alderson could work if the work was limited, consistent with the ALJ's findings to simple tasks and routine work and limited social interactions. In other words, the ALJ relied on medical opinions that came later in time, those of Dr. Brown and Dr. Gilbert and Dr. Rubin. These doctors had a greater opportunity to review the record. The ALJ's assessment was reasonable and should be affirmed. Could you address the point that Judge Gilman raised earlier, which is that the ALJ has a duty to develop the record. And here the most recent psychological exam was, I think, a couple of years before Dr. Rubin, on who the ALJ relied, said there should be another one. Why shouldn't the ALJ have directed that there be another exam? So here, the record was thoroughly developed in this case. It contained the results of a psychological consultative exam, as you pointed out, from September 2016. And this was well within the period of alleged disability that began on June 2016. Then there were two state agency psychological medical consultants that offered opinions regarding Ms. Alderson's mental health limitations, one of whom reviewed and commented on the consultative exam findings from September 2016. And then having reviewed these documents, the ALJ went even a step further and arranged to have this psychological medical expert review the entire record and provide opinions at Ms. Alderson's hearing. So, with this substantial development of the record, Ms. Alderson fails to establish it was ambiguous or inadequate to allow for proper evaluation. And that's the standard for these matters. Well, let me ask you this. In 2016 was that psychological examination. She tried to commit suicide in 2017, didn't she? Yes. She was hospitalized. That's true. It seems to me, well, that was a fairly significant event that might need a psychological update. Right. The ALJ specifically addressed that in her opinion at ER 19. She noted that there was an emergency room visit for a suicide attempt in December 2017. And then she emphasized that the suicide attempt was situational and the result of a single depressive episode. That was per Ms. Alderson's mother who said that. It doesn't seem consistent with the record because the record seems to show that she's had suicidal tendencies since she was 13 years old. Well, when she went to the hospital, she did report. There's a note, I think, at ER 629 from that emergency review visit that does cite a breakup or maybe romantic problems or something as the reason for the suicide attempt. Also, the month before that suicide attempt, she had weaned herself off her medications and reported that her depression was stable. And then she was seen in the emergency room for that suicide attempt in December 2017, which, as you know, Your Honor, her mother did cite the recent breakup as the only reason for that suicide attempt. She had other cuttings. She had been cutting herself several years before that, hadn't she? Well, I wasn't sure if the cutting was from that particular suicide attempt or from... I thought it was from that attempt. I thought that the cuttings were a reference only to that one emergency room visit. It seems to me the record has some evidence of her having these suicidal attempts and tendencies well before this 2017. If you look at the period for which she's alleging disability, it's a two-year period, June 2016 through July 2018. She's doing moderately well. I mean, the ALJ does account for several impairments in the RFC. But she's alleging that she couldn't work at all, even with significant accommodations. And even if you look at the work that she was doing, Mr. Tree has pointed to, you know, she was working at an auto auction. This is discussed in the record at ER 54 and was having difficulties. But when the ALJ specifically asked her, you know, how's it going, she said, oh, you know, I'm really tired. She complained of physical problems. She was walking five hours, I think, a day. And that was too much walking. And then the ALJ limited her to two hours per day in the RFC. But she doesn't say anything about more social, cognitive problems at this job. And again, if you look at ER 552, this is, I think, Dr. Schultz's psychological evaluation where the claimant talks about a job at Labor Ready. She says, you know, I couldn't stand as part of the problem worth working at Labor Ready. And she could not be around people. Well, that problem with being around people also was accommodated in the RFC. So I think what you see here is, yes, she had problems. But the ALJ accommodated very, very significant problems in the RFC. And I would like to go back to Dr. Rubin's opinion. Because I think that the way that basically what he was saying, and I think this is very telling and sort of sets the tone for the entire record, is that, you know, he said, yes, I see Dr. Schultz has noted attendance problems. Again, Dr. Schultz actually didn't specify any specific days that would be missed. It was some vague sort of reference to attendance problems based on social issues. But Dr. Rubin then said there might be some motivational factors at play. He then went on to note that Ms. Alderson, who was only 19 years old when she applied for disability, would benefit from work. It would help with her self-esteem and self-worth and make her feel more like an adult and more functional than staying home. He also proposed limitations that would lower the hurdles to working, such as work without complex tasks or a high pace or high stress or contact with the public. And the ALJ incorporated restrictions that aligned with these opinions. The ALJ was the fact finder at the hearing who had the opportunity to hear from Dr. Rubin in person. And her interpretation of Dr. Rubin's statements was reasonable and provides no basis for remand in this case. Regarding Dr. Brown's opinion, Dr. Brown stated that Ms. Alderson was not disabled after opining that she had limitations similar to the limitations noted by Dr. Rubin. His opinion also does not provide a basis for remand. Dr. Gilbert, his opinion emphasized that Ms. Alderson remained capable of simple tasks with reasonable concentration, pace, and persistence, attending work within customary tolerances, working within a routine, and completing a normal work day and work week. And the ALJ incorporated limitations that aligned with this opinion. In the briefing, Ms. Alderson focuses on the first half of one sentence in Dr. Gilbert's opinion that mentions occasional difficulties when symptomatic. But the opinion does not state that Ms. Alderson is always symptomatic. And the second half of that same sentence provides more detail and states that Ms. Alderson can work with the limitations incorporated in the residual functional capacity and could complete a normal work day and work week. So again, this is a case where the ALJ harmonized these three consistent medical opinions that all pointed to the same conclusion about Ms. Alderson, who was a young person, still a bit unsettled, as is typical at age 19. She was coming to terms with adulthood and had difficulties, but she could work. And in fact, work may be part of the solution to her problems, as Dr. Rubin suggested. The ALJ's decision was reasonable and should be affirmed. Turning to Dr. Schultz, the ALJ gave several valid reasons for discounting Dr. Schultz's opinion. And Ms. Alderson appears to suggest that the ALJ should have adopted additional cognitive and social limitations based on Dr. Schultz's report. But again, the residual functional capacity accounts for significant cognitive and social limitations. And to the extent Ms. Alderson argues that the ALJ erred by not adopting even greater social and cognitive limitations, it is difficult to see how Dr. Schultz's vague opinion would support greater limitations when it was so unspecific. I see that I am over time, and so if there are no further questions, we ask the court to affirm because the ALJ's decision was supported by substantial evidence. Counsel, you're just slightly over your time, but if you need another minute or two for your argument, you can have it. I don't have anything more, Your Honor, and I would be happy to answer questions. Okay. Any questions from Judge Miller or Judge Gilman? Okay, no questions. Now we'll permit rebuttal argument. Thank you, Your Honor. Interestingly, as we spoke of previously, Dr. Rubin requested a consultative exam. He also said she should try work. He didn't say she could work. He said she should try work and see if she could do it. He was very interested to find out if she was actually trying it, and Dr. Rubin asked the question, how is she doing? That was not allowed to be answered, so Dr. Rubin didn't have that information that she was doing very poorly in work, which is clearly in the record. Dr. Rubin, though, says, I can't tell what her functioning is in 2018 without an updated psychological evaluation. We need to have one. When asked to do so by Ms. Alderson's counsel, the ALJ said, and this is at ER 68, it is my opinion that she's very capable based on this record. I deny the request. Well, that's quite inconsistent with what's in the briefing from the commissioner in their brief. They said, yeah, she does have significant problems. There are extensive postural, environmental, mental, and social limitations, quite contrary to what the ALJ found at the conclusion of the hearing, that she's capable based upon this record. Okay, counsel, I'm afraid you're over your extended time, and so if you can, please wrap up your argument.  I guess I would just like to say that what the ALJ said, that she had improved with treatment, but at best, she waxed and waned with treatment. At the beginning, she was depressed. She was vomiting due to stress. She was lashing out. She was tired. Her motivation, her doctor said, wasn't because she was lazy. It was secondary to her depression, a common and a hallmark symptom of depression, lack of motivation. Thank you. I wouldn't be like the former Chief Justice Redquist and cut you off in mid-sentence, but to be fair to both sides, we've got to stay close to our times. I understand. Thank you. So I thank counsel, Mr. Tree, Ms. Stuckey. You've both made great arguments for your clients, and we appreciate that. Again, we recognize it's difficult and even be hazardous to be an advocate in the time of coronavirus. So thank you for that. At this point, Alderson v. Saul shall be submitted, and the parties will hear from the panel in due course.
judges: Gilman, Gould, Miller